IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KENDRA R. KINGSBURY,<br><br>Defendant. | No. 21-00101-01-CR-W-SRB |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned attorneys, in anticipation of sentencing currently scheduled for June 21, 2023, respectfully provides the Court with the following overview of the Government's sentencing recommendation, which includes the following:

   A.   *Procedural History*

   B.   *Sentencing Guidelines Calculations*

   C.   *Additional Facts of the Case*

   D.   *Sentencing Factors Under 18 U.S.C. § 3553(a)*

   E.   *The Government's Sentencing Recommendation*

A.   **Procedural History**

On May 18, 2021, a federal grand jury for the Western District of Missouri returned a two count Indictment against Kendra Kingsbury (hereafter, "the defendant"). (D.E. 1.) Counts One and Two charged the defendant with the willful retention of national defense information, in violation of 18 U.S.C. § 793(e). (*Id*.) On October 13, 2022, the defendant pled guilty to both Counts One and Two without a plea agreement. (D.E. 29.)

B. *Sentencing Guidelines Calculations*

The final Presentence Investigation Report (PSR) calculated the defendant's total offense level as 23, with a Criminal History of I, for an advisory Guidelines range of 46 to 57 months of imprisonment. (D.E. 12, 17.) The defendant has made multiple objections to the PSR that do not affect the Guidelines range. (D.E. 36, 20.)

C. *Additional Facts of the Case*

The facts contained in this sentencing memorandum are meant to supplement the facts contained in the PSR. The facts in the PSR are accurate and neither the government nor the defense have objected to their inclusion or accuracy. The government intends to establish the facts below through the testimony of Special Agent Joel Feekes of the FBI at the sentencing hearing.

Repeatedly, over the course of her FBI employment and during her over 12 and a half years holding a security clearance, the defendant removed from the FBI and retained in her personal residence an abundance of sensitive government materials, including classified national defense information and other classified documents. The defendant removed and unlawfully and willfully retained the hundreds of classified documents despite having received training, over and over again, regarding the dangers associated with disclosing or exposing to disclosure classified information. During her FBI employment, the defendant completed 1,640 hours of training, including various trainings that covered the proper handling of classified materials. The defendant also signed multiple employment agreement forms with the FBI that outlined her obligations and the rules and policies that applied to her ability to access and review classified material, as well as the need to protect the secrecy of such information for the duration of her employment and in fact for all time unless and until declassified.

In total, the defendant improperly removed and unlawfully and willfully retained approximately 386 classified documents in her personal residence. The FBI ultimately determined

that over 20,000 documents that originated either at the FBI or some other government agency were found in the defendant's residence. Some of the classified documents the defendant unlawfully removed and kept in her home contained extremely sensitive national defense information. The documents retained by the defendant in her residence included documents in electronic format on hard drives, compact discs, and other storage media. The FBI was able to determine that the defendant had initiated searches in classified FBI databases utilizing information obtained from the sensitive and classified government materials discovered in the defendant's residence that were improperly removed, and unlawfully and willfully retained by the defendant. As further explained in three classified declarations submitted to this Court *in camera* in connection with this sentencing, the defendant put national security at risk by retaining classified information in her home that would have, if in the wrong hands, revealed some of the government's most important and secretive methods of collecting essential national security intelligence.

The FBI, of course, investigated what uses the defendant put to the classified documents she illegally removed from the secure workspace, but the investigation revealed more questions and concerns than answers. SA Feekes conducted a review of the defendant's telephone records. The defendant used and maintained a home phone at her residence. This phone number, active from January 1, 2008, to in or about January 2018, was provided by AT&T. Phone toll records were obtained by the FBI dating back to 2004, when the home phone number was maintained by Time Warner. The defendant also maintained a cellular telephone number through Verizon. Phone toll records were obtained for the defendant's cell phone. The home phone was confirmed to belong to the defendant by SA Feekes through the comparison of known callers to the defendant's home phone. The Verizon cell phone number is the same number that the defendant used to contact SA Feekes during the investigation.

A review of the toll records revealed that the defendant contacted phone numbers associated to subjects of counterterrorism investigations in the Western District of Missouri and other parts of the United States. The following are examples of the type of contacts between the defendant's phones and phone numbers associated to counterterrorism subjects:

1. On April 2, 2016, the defendant made a call from her personal cell phone to a number believed to be associated to a counterterrorism subject. After the initial call from the defendant, five calls were made from the number associated to the counterterrorism subject to the defendant's personal cell phone number. The five calls from the number associated with the counterterrorism subject ranged in duration from one to two minutes and were made on the same day the defendant made her call. These calls all occurred after the investigation into the counterterrorism subject was closed in November of 2012. In 2011, another phone number associated to the same counterterrorism case was in contact with the defendant's home phone number.

2. The defendant received two calls from a phone number associated to the subject of a counterterrorism investigation to her personal cell phone in 2012. The investigation into this counterterrorism subject was closed in 2006 after a sentencing hearing. After those two calls, the defendant made a call from her personal cell phone to another number that was believed to be associated with the same subject of the counterterrorism investigation. The defendant then received another call from the first number associated to the subject of the counterterrorism investigation. All these calls were one to two minutes in duration.

3. In 2011, a phone number that associated to individual who was part of a counterterrorism investigation received six calls in total from the defendant's home phone number.

4. In 2018, a call was made from a phone number associated to a counterterrorism suspect to the defendant's home phone. The duration of this call was 20 seconds.

5. In 2008 the defendant's home phone was called by a phone number associated to a counterterrorism suspect for a total of 42 seconds.

6. Beginning on December 20, 2016, and ending on January 19, 2017, a cell phone number belonging to the subject of a counterterror investigation was in contact with the defendant's personal cell phone number on multiple occasions.

7. On January 15, 16, and 17 of 2007 a phone number associated to the subject of a counterterrorism investigation from a different FBI Division called the defendant's home phone number. After the subject of the counterterrorism investigation contacted the defendant's home phone, the defendant then conducted a total of four searches in FBI databases for the subject's name and telephone number. The defendant was never assigned to work on the counterterrorism case from a different FBI Division that associated to this counterterrorism subject.

Investigators have not been able to determine why the defendant contacted these individuals, or why these individuals contacted the defendant. When confronted with this information, the defendant denied having the home telephone number mentioned above. The defendant denied making and receiving these calls and could offer no explanation as to why she would have received or made these calls. Through the collected toll records, SA Feekes was able to identify other suspicious calls to and from the defendant's phone numbers dating back to 2000 and prior to her employment with the FBI, including one call that lasted over 38 minutes.

The defendant was interviewed twice by SA Feekes, first in January of 2018, and again in September of 2018. During the first interview the defendant provided the FBI with four different email accounts that she maintained, but indicated she had deleted the contents of one email account

just prior to her interview. The defendant denied destroying any evidence since her initial disclosure to the FBI regarding the materials in her home, but she did admit that she periodically destroyed documents in her home that she had taken from the FBI. She specifically referenced a time around Labor Day of 2017 when the defendant had a document that she admitted might have been classified as TOP SECRET. The defendant claimed she destroyed the document by ripping it up, soaking it in water, and putting it down a drain. The defendant told SA Feekes that she decided to self-report the documents in her home because she felt like she was being followed in her neighborhood and was under surveillance. The defendant referenced an event that occurred between her daughter and someone at Disneyland that made her destroy a previously owned laptop. The defendant's daughter, according to the defendant, met a Russian man at Disneyland and they exchanged Facebook information. After the exchange, the laptop her daughter took to California became, in the words of the defendant, "wonky." The defendant then destroyed the laptop with a hammer.

  The second interview of the defendant, which was also the last interview of the defendant, was conducted by SA Feekes and another FBI Special Agent. The defendant denied conducting unauthorized searches on FBI databases that were outside the scope of her position, but did say that she attempted to help a family member by conducting searches for information on individuals. She also mentioned conducting searches to help out local law enforcement. The defendant denied conducting any searches that were unauthorized or outside of her assignments as an analyst with the FBI. As SA Feekes will testify, these explanations by the defendant about her actions are contradicted by the evidence of the defendant's unauthorized searches on FBI databases discovered during the investigation.

  After the indictment was returned, the government offered the defendant the opportunity to meet with prosecutors and explain her actions, making clear that the government's primary

6

interest was mitigating security risks associated with the defendant's unlawful retention of national defense information and the importance in that regard for investigators to understand why the defendant took the classified materials home and how she used them. The defendant declined to provide the government with any further information.

D.     *Sentencing Factors Under 18 U.S.C. § 3553(a)*

To properly sentence the defendant, the Court must deduce a "reasonable" sentence which is presumed, but not required to be, within the advisory Sentencing Guidelines, and takes into account the sentencing factors described in 18 U.S.C. § 3553(a). *United States v. Farmer*, 647 F.3d 1175, 1178-79 (8th Cir. 2011). In this case, the factors listed in Section 3553 as to this defendant can be summarized as follows:

1.     *Nature and Circumstances of the Offense.*

The defendant knowingly and willfully retained 386 classified documents in her home. Twenty of these documents, which consist of national defense information, form the basis of Counts One and Two, to which the defendant has pled guilty. The defendant retained these documents in an unsecure space, readily available to whoever may have had access to her residence. It is impossible to know if there were other classified documents that were destroyed, removed, or otherwise disseminated during her 12 and a half years of holding a security clearance. As the defendant admitted to SA Feekes, she retained and destroyed other documents over the years that could have contained classified and/or national defense information.

The nature of some of the documents the defendant possessed did not correlate to her assigned work at the FBI. This is evident from the nature of the documents, which have been reviewed by the Court *in camera*, and from the fact that the defendant was performing unauthorized searches in FBI databases that did not apply to items she was working on, or in at

7

least one instance, searches that pertained cases that were not within the purview of the Kansas City Division of the FBI.

The investigation into the defendant's phone records indicate that the defendant, without explanation, was in contact with phone numbers associated with counterterrorism subjects during her employment with the FBI. The defendant also performed searches on the same subjects in FBI databases near in time to the contact she had with those phone numbers. The calls to and from the defendant to phone numbers associated with counterterrorism subjects began in 2000 and continued into 2016. To date, the FBI has been unable to determine the purpose or nature of those phone calls. What is clear is that the various calls listed above occurred during the time the defendant was in possession of, and retaining in her residence, various classified documents, some of which contained national defense information, were classified at the SECRET level or above, and related to U.S. government counterterrorism investigations and/or efforts.

2. *History and Characteristics of the Defendant.*

The defendant has no prior criminal history. The defendant had been employed in a law enforcement capacity for the majority of her career. However, the defendant abused her position and access to classified information. The defendant intentionally violated rules, regulations, and laws that she had been advised of, trained on, and acknowledged repeatedly throughout the entirety of her employment with the FBI. The event that caused the defendant to disclose her illegal activity was the defendant's concern that she was being followed and surveilled. Arguably, the defendant's partial disclosure occurred out of a sense of self-preservation, rather than any desire to abide by the FBI's rules and regulations, or the laws of the United States.

3. *Seriousness of the Offense / Promote Respect for the Law / Just Punishment.*

The defendant exposed the FBI and other government agencies to the possibility of unauthorized disclosure of information classified at the SECRET level. As demonstrated in the

8

Case 4:21-cr-00101-SRB   Document 38   Filed 06/12/23   Page 8 of 12

three classified declarations reviewed by the parties and this Court, the discovery or disclosure of the classified national defense information contained in the 20 Indictment documents could have had terrible consequences for both agencies and their ability to operate effectively to protect the national security of the United States.

The defendant knew that unauthorized removal of classified materials and transportation and storage of classified materials in unauthorized locations risked disclosure and transmission of those materials, and therefore could endanger the national security of the United States and the safety of its citizens. In particular, the defendant was advised that unauthorized disclosure of SECRET information reasonably could be expected to cause serious damage to the national security of the United States, and that violation of rules governing the handling of classified information could result in criminal prosecution.

There is no way to know if the information that the defendant retained was discovered by someone, shared with someone, or used against the interests of the United States. Any sentence this Court imposes should take into account the severity of the risk the potential disclosure of the documents named in Counts One and Two poses to the national security of the United States. In considering this factor, the Court should consider that there is no way to know when the documents were obtained, how long they were retained, or who may have been exposed to, absorbed, and possibly communicated the information contained in the 20 documents named in Counts One and Two.

4. *Deterrence and Protection of the Public.*

The sentence decided upon by this Court should be one that acts as an effective deterrent and protects the public. That is, in the case of this defendant, admittedly a difficult proposition. Regarding general deterrence, the Court should impose a sentence that reflects the severity of the defendant's criminal actions in order to deter others from engaging in the willful retention of

classified, national defense information that could be used to injure the national security of the United States. As to specific deterrence, this defendant was unhelpful during the investigation, denying the use of her home phone and refusing to acknowledge the calls from her personal cell phone when asked about the above listed contacts between her phones and phone numbers associated to counterterrorism subjects. Any sentence should consider the need to specifically deter this defendant from using or attempting to use whatever information she may have retained in a manner that could be injurious to the national security of the United States, including but not limited to any specific recollection she may have of the contents of the classified documents that she unlawfully retained. Because of these unique concerns about the defendant's ability to cause damage to the national security interests of the United States based on information she may have gleaned from the documents she retained, a sentence of imprisonment will protect the public from further potential damage from the release of any of the classified information that the defendant may divulge.

5. *Effectively Provide Defendant with an Opportunity to Rehabilitate.*

Any sentence handed down by this Court will provide this defendant with an opportunity to rehabilitate herself, and would allow her to be supervised by Probation once her sentence has been completed.

E. **The Government's Specific Sentencing Recommendation**

The defendant was more than reckless or careless with the trust that was placed in her by the FBI. The defendant intentionally violated her employment agreement, her training, the rules and regulations of the FBI, and the laws of the United States when she violated the trust that was placed in her to handle classified information. The defendant's partial disclosure of her continuous violation of the laws of the United States with regard to the willful retention of national defense information and other classified information only occurred after the defendant felt her own safety

10

was at risk. The defendant never demonstrated any concern for the safety of all of those individuals who could have, and may have, been impacted through her reckless disregard for the laws of the United States and the procedures in place to protect classified information from dissemination. The defendant's apparent use of the information she learned through her access to classified documents and FBI databases on counterterrorism subjects, as demonstrated through the toll records for the defendant's phones, only highlights the fact that this defendant was not just reckless, but intentionally acting contrary to the interests of the national security of the United States. Based on all the above factors, the Government recommends a custodial sentence of 57 months, followed by three years of supervised release. This recommendation addresses the sentencing factors set forth in 18 U.S.C. § 3553(a).

                Respectfully submitted,

                Teresa A. Moore
                United States Attorney

By    /s/ Patrick C. Edwards

                Patrick C. Edwards
                Assistant United States Attorney
                Charles Evans Whittaker Courthouse
                400 East 9th Street, Room 5510
                Kansas City, Missouri 64106
                Telephone: (816) 426-3122

                */s/ Scott A Claffee*

                Scott A. Claffee
                Trial Attorney
                National Security Division
                Counterintelligence & Export Control Section

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing was delivered on June 12, 2023, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record:

*/s/ Patrick C. Edwards*
Patrick C. Edwards
Assistant United States Attorney